## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MICHAEL HUERTA, Administrator, : | |
| Federal Aviation Administration, : | Case No. 3:16-cv-358(JAM) |
|     Petitioner, : | |
| : | |
| v. : | |
| : | |
| AUSTIN HAUGHWOUT and : | |
| BRET HAUGHWOUT, : | |
|     Respondents. : | March 22, 2016 |

### SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF PETITION FOR ENFORCEMENT OF ADMINISTRATIVE SUBPOENA

Pursuant to this court's March 1, 2016 order (docket no. 4), the petitioner, Michael Huerta, Administrator, Federal Aviation Administration ("FAA"), through undersigned counsel, submits this supplemental memorandum in response to the court's request for additional information regarding and in further support of his petition seeking the summary enforcement of two administrative subpoenas (the "Subpoenas") with which the respondents refused to comply.

As set forth in greater detail below: (1) both the plain language of the relevant statutes and regulations and applicable administrative case law demonstrate that the unmanned aircraft system (UAS) operated by the respondents is an "aircraft" subject to the FAA's authority and safety regulations, and, in any event, the court must defer to the FAA's exercise of authority over the UAS at this investigatory stage because the exercise of such authority is not frivolous; (2) the documents requested by the Subpoenas are relevant to the FAA's investigation into the circumstances surrounding the respondents' use of a UAS and the characteristics of the UAS itself, and the court should defer to the

agency's determination of relevance because the respondents are unable to prove that the requests are unreasonable or oppressive; and (3) the FAA undertook efforts to informally obtain the requested information prior to serving the Subpoenas, but the respondents indicated that they would not provide such information unless compelled by court order and that they intended to vigorously contest the FAA's ability to obtain the requested information, including by way of appeal of an enforcement order from this court, if necessary.

Because the Subpoenas satisfy the preconditions for summary enforcement under Second Circuit law, the petitioner respectfully urges this court to issue an order enforcing the Subpoenas.

**I.     The Respondents' UAS is an Aircraft
        Subject to the FAA's Safety Regulations**

The court has requested additional information concerning the basis for FAA jurisdiction over this matter, namely, the use of the UAS depicted in the two videos apparently uploaded by the respondent, Austin Haughwout, to YouTube.  In sum, the FAA's enabling statute and safety regulations broadly define an "aircraft" that is subject to FAA regulatory authority, and the FAA Modernization and Reform Act of 2012 referenced by Bret Haughwout in his email to counsel for the FAA did nothing to change that (indeed, if anything, the statute clarified that so-called "model aircraft," including UAS, are "aircraft" subject to the FAA's safety regulations).  Moreover, at the investigatory stage the court is not called upon to make a finding as to whether a respondent actually falls within the authority of the investigating agency; rather, Second Circuit precedent dictates that a court defer to an agency's exercise of authority over a

respondent unless that assertion is patently false, and the FAA's assertion of authority plainly satisfies that test.

> A. The Plain Language of the Applicable Statute and Regulation
> <u>Grants the FAA the Authority to Regulate the Respondents' UAS</u>

Pursuant to 49 U.S.C. § 40103(b), the FAA is required to "assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace" and to prescribe regulations regarding "the flight of aircraft" to, inter alia, "protect[] individuals and property on the ground." The statute broadly defines "aircraft" as "any contrivance invented, used, or designed to navigate, or fly in, the air." <u>Id.</u> § 40102(a)(6). Moreover, 49 U.S.C. § 40113(a) states that the petitioner "may take action [he] considers necessary to carry out this part, including conducting investigations, prescribing regulations, standards, and procedures, and issuing orders." Exercising its authority under subtitle VII of Title 49, the FAA has promulgated regulations concerning aircraft safety, including 14 C.F.R. § 91.13(a), which provides that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." The FAA also has promulgated a broad regulatory definition of "aircraft" as "a device that is used or intended to be used for flight in the air." 14 C.F.R. § 1.1.

The respondents' use of a UAS falls within the scope of the FAA's authority as set forth in the plain language of the above statutory and regulatory scheme. Specifically, the UAS shown in the respondents' videos is an "aircraft" because, even though it is unmanned, it is a contrivance/device that is invented, used, or designed to fly in the air. That is all that is required to meet the statutory and regulatory definitions of "aircraft,"

and the respondents' UAS unambiguously satisfies those definitions.[1]  In the same vein, certain of the FAA's regulations, including 14 C.F.R. § 91.13, apply to all aircraft, regardless of whether such aircraft is manned or unmanned and irrespective of the altitude at which the aircraft is operating.  There is no limiting language in that regulation that would prevent its application to the respondents' operation of the UAS in this case, and 14 C.F.R. § 91.13(a) therefore prohibits any person from operation an aircraft (including a UAS) at any altitude "in a careless or reckless manner so as to endanger the life or property of another."  Consequently, an investigation into a possible violation of that regulation by the respondents in connection with their operation of the UAS in this case falls within the scope of the FAA's authority.

       B.       Administrative Case Law Supports the FAA's
              Authority to Regulate the Respondents' UAS

While the application of the FAA's regulatory scheme to a UAS has not, to the undersigned's knowledge, been examined by a court, the National Transportation Safety Board (NTSB), which by statute has appellate jurisdiction over FAA enforcement orders; see 49 U.S.C. § 1133; has adopted the FAA's interpretation.  See Huerta v. Pirker, Docket CP-217 (N.T.S.B. Nov. 17, 2014) (copy attached as Exhibit 1).  In Pirker, the FAA assessed a $10,000 penalty against the respondent for violating 14 C.F.R. § 91.13(a)

---

[1]The petitioner recognizes that the court has expressed concern regarding the breadth of the statutory and regulatory definitions of "aircraft" in that those definitions could reach any number of things (by way of the court's example, a paper airplane) that would not generally be considered to be subject to the FAA's regulatory authority.  For purposes of this case, however, the court need not decide whether there is some outer boundary at which an object might satisfy the relevant statutory and regulatory definitions but that nevertheless may not be regulated by the FAA because in this case, the respondents' UAS – which appears to be self-propelled and capable of causing injury of person or property – is well within that boundary.

in connection with his operation of a UAS in and around the University of Virginia campus.  Pirker, at 1-2.  The respondent appealed the enforcement order to an administrative law judge, who dismissed the enforcement proceeding after concluding that the UAS was not an "aircraft" for purposes of the regulation.  Id. at 2.  The FAA appealed the ALJ order to the NTSB, which reversed, concluding that a UAS meets the plain and unambiguous language of the statutory and regulatory definitions of "aircraft."  Id. at 2, 12.

In Pirker, the NTSB undertook essentially the same analysis of the statutory and regulatory language that the FAA set forth above.  Specifically, the NTSB observed that the FAA's "authority to ensure aviation safety largely rests upon the Administrator's statutory responsibility to regulate the operation of 'aircraft'" and recited the statutory and regulatory definitions of that term.  Id. at 5.  The NTSB then concluded that: (1) "[t]he definitions are clear on their face" (id.); (2) even assuming, arguendo, that the UAS could be a "model aircraft," "the definitions do not exclude even a 'model aircraft' from the meaning of 'aircraft'" (id.); (3) "the definitions draw no distinction between whether a device is manned or unmanned" (id. at 5-6); and (4) previous FAA advisories did nothing to exclude unmanned or model aircraft from the regulations applying to an "aircraft."  Id. at 7-8.  "In summary, the plain language of the statutory and regulatory definitions is clear: an 'aircraft' is any device used for flight in the air," and a UAS is such a device.  Id. at 7.

With those definitions in mind, the NTSB went on to conclude that the FAA's application of section § 91.13(a) to the respondent's UAS was a reasonable construction

of that regulation "given the broad language of the section." Id. at 9. In so doing, the NTSB properly acknowledged the deference owed to the FAA's interpretation of the statutes and regulations that it implements. Id. at 8. Like the NTSB, this court is obligated to defer to reasonable FAA interpretations, including those interpretations proffered via adjudication. See I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 425, 119 S. Ct. 1439, 1445, 143 L. Ed. 2d 590 (1999) (Chevron deference owed to agency interpretation of ambiguous statutory terms "through a process of case-by-case adjudication" (internal quotation marks omitted)); Garvey v. Nat'l Transp. Safety Bd., 190 F.3d 571, 577 (D.C. Cir. 1999) ("like the NTSB, we must defer to the FAA's interpretations of its own aviation regulations"); Linares Huarcaya v. Mukasey, 550 F.3d 224, 229 (2d Cir. 2008) ("Auer requires that an agency's interpretations [of its own regulations] are . . . entitled to deference and are controlling unless plainly erroneous or inconsistent with the regulation" (alteration in original; internal quotation marks omitted)). Here, to the extent that the court concludes that either the statutory or regulatory definition of "aircraft" is ambiguous,[2] the FAA's interpretation, as evidenced by the Pirker adjudication, should control.

---

[2] It is black-letter administrative law that "Auer deference, like Chevron deference, is warranted only when the language of the regulation is ambiguous." Linares Huarcaya v. Mukasey, 550 F.3d 224, 229 (2d Cir. 2008) (internal quotation marks omitted). In this case, for the reasons described above, the statute and regulation in question unambiguously include a UAS within their reach, and the court therefore need not reach "step two" of a deferential framework. Nevertheless, even if the "aircraft" definitions were ambiguous, the FAA's interpretation of those provisions as reaching the respondents' UAS is reasonable, and the court therefore would be required to defer to that interpretation.

The NTSB's decision in <u>Pirker</u> was not appealed and remains the only decision adjudicating the scope of the FAA safety regulations with respect to their application to UAS.  The reasoning of the Board in <u>Pirker</u> is sound and properly gives effect to both the plain meaning of the text in question and to the deference owed to the FAA interpretation of both the relevant statute and especially its own regulations.  For the foregoing reasons, then, the respondents' operation of the UAS in this case falls within the authority granted by Congress to the FAA, and an investigation into such operation is pursuant to a legitimate purpose.

    C.    <u>The FAA Modernization and Reform Act of 2012 Does Not Dictate a Different Result</u>

The above analysis is no less persuasive after the passage of the FAA Modernization and Reform Act of 2012 (Public Law 112-95, the relevant excerpt of which is attached hereto as Exhibit 2),[3] which the respondents have argued exempts so-called "model aircraft" from the FAA's regulations.  The respondents misconstrue that statute, which, if anything, reinforces the FAA's position that a "model aircraft" also is an "aircraft" subject to the FAA's existing safety regulations.  At the outset, the statute makes clear that a "model aircraft" is simply a type of "aircraft," which as set forth above is a defined term elsewhere in the statute and in the FAA's regulations.  Specifically, a "model aircraft" must be an "unmanned aircraft," and an "unmanned aircraft" simply is defined as "an aircraft that is operated without the possibility of direct human intervention from within or on the aircraft."  <u>See</u> P.L 112-95 sec. 336(c) (defining "model

---

[3] The October 11, 2011 operation of the UAS by the respondent in <u>Pirker</u> predated the passage of the 2012 Act, which was signed by the President on February 14, 2012.

7

aircraft"); sec. 331(8) (defining "unmanned aircraft"). Because a "model aircraft" is an "aircraft," FAA regulations pertaining to aircraft consequently apply to model aircraft.

The 2012 Act does prohibit the FAA from issuing regulations regarding certain model aircraft; <u>see</u> Section 336(a) (FAA "may not promulgate any rule or regulation regarding a model aircraft, or an aircraft being developed as a model aircraft, if" certain criteria are met); but that limitation contains two important caveats:

First, the statute only prohibits the FAA from issuing a rule or regulation "regarding" a model aircraft. As such, the prohibition by its terms is both forward looking and applies only to regulations specifically targeting model aircraft. Nothing in the statute prohibits the FAA from relying upon existing regulations of general applicability, especially (as will be seen below) where those regulations concern safety.

The second caveat is that the statute contains an explicit construction stating that it should not be construed to limit the FAA's authority "to pursue enforcement action against persons operating model aircraft who endanger the safety of the national airspace system."[4] P.L. 112-95, sec. 336(b). Consequently, regardless of what limitations the statute might place on general rulemaking, the FAA maintains the authority to enforce safety regulations (including, by way of example, 14 C.F.R. § 91.13) against model aircraft.[5]

---

[4] The national airspace system is defined, in pertinent part, as "[t]he common network of U.S. airspace." Federal Aviation Administration, Aeronautical Information Manual, at p. 663 (Apr. 3, 2014), available at http://www.faa.gov/air_traffic/publications/media/AIM_Basic_4-03-14.pdf.

[5] The FAA has interpreted the 2012 Modernization Act in the same way. On June 25, 2014, the FAA, through notice-and-comment rulemaking, issued an interpretive rule concerning Section 336 of the 2012 Act. <u>See</u> Interpretation of the Special Rule for Model

Even if the 2012 Act did restrict the FAA's ability to enforce its already-in-effect safety provisions against certain "model aircraft" (which by its terms the Act does not do), it is not at all clear that the respondents' UAS meets the statutory criteria for a model-aircraft exemption from FAA regulation. Specifically, as noted above, the statute does restrict the FAA from regulating certain model aircraft. But without obtaining additional information from the respondents, the FAA simply does not know whether their UAS meets those criteria, namely whether: (1) the aircraft is flown strictly for hobby or recreational use; (2) the aircraft is operated in accordance with a community-based set of safety guidelines and within the programming of a nationwide community-based organization; and (3) whether the aircraft is under fifty-five pounds or is certified for a greater weight. See P.L. 112-95, sec. 336(c). The respondents cannot reasonably be

---

Aircraft, 79 Fed. Reg. 36172 (June 25, 2014) (copy attached as Exhibit 3). In that document, the FAA concluded, among other things, that: (1) "[i]n Section 336, Congress confirmed the FAA's long-standing position that model aircraft are aircraft" (id. at 36173); (2) "Congress has restricted the FAA from promulgating regulations, from the date when the statute was enacted, specifically regarding model aircraft that meet the terms of the statute" (id.); and (3) "regardless of whether a model aircraft satisfies the statutory definition and operational requirements described above, if the model aircraft is operated in such a manner that endangers the safety of the [national airspace system], the FAA may take enforcement action consistent with Congress' mandate." Id. at 36175.

The FAA's interpretation is in accord with the statutory text for the reasons set forth above and is subject to, at a minimum, Skidmore deference. Cf. Murphy ex rel. Estate of Payne v. United States, 340 F. Supp. 2d 160, 183 n.12 (D. Conn. 2004) (regulations that "have the status of interpretive, rather than legislative, rules under the Administrative Procedure Act, in that they were not promulgated pursuant to notice-and-comment rulemaking procedures" are entitled to Skidmore deference). "Under Skidmore, [t]he weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Id. (alterations in original; internal quotation marks omitted).

permitted to rely upon a statutory construction (of dubious validity in the first instance) and then refuse to allow the FAA to conduct an investigation, part of which will reveal whether the respondents' UAS falls within the scope of the very statute upon which they rely.

>   D.   The Court is Required to Defer to the FAA's
>        Assertion of Authority at the Investigatory Stage

In light of the broad language of the statute and regulation in question, the deference owed by the court to the FAA's interpretations of them, and the NTSB decision in Pirker, a UAS is an aircraft subject to the FAA's safety regulations. However, that precise question is not actually even before the court at this point, where the FAA simply is attempting to investigate a potential violation of its regulations. "At this stage in the proceedings, 'courts need not determine whether the subpoenaed party is within the agency's jurisdiction or covered by the statute it administers.'" United States v. Beacon Aerospace Corp., No. 3:99-MC-146(EBB), 2000 WL 92350, at *2 (D. Conn. Jan. 11, 2000) (copy attached as Exhibit 4) (quoting United States v. Construction Prods. Research, Inc., 73 F.3d 464, 470 (2d Cir. 1996)); see also F.T.C. v. Ken Roberts Co., 276 F.3d 583, 586 (D.C. Cir. 2001) ("Following [Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S. Ct. 339, 87 L. Ed. 424 (1943)], courts of appeals have consistently deferred to agency determinations of their own investigative authority, and have generally refused to entertain challenges to agency authority in proceedings to enforce compulsory process."); United States v. Sturm, Ruger & Co., 84 F.3d 1, 5-6 (1st Cir. 1996) ("As long as the agency's assertion of authority is not obviously apocryphal, a procedurally sound subpoena must be enforced."); United States v. Construction Prods. Research, Inc., 73

F.3d at 470 ("the coverage determination should wait until an enforcement action is brought against the subpoenaed party").

Deference to an agency's assertion of authority at the investigatory stage is consistent with the principle that "[t]he courts' role in a proceeding to enforce an administrative subpoena is extremely limited." RNR Enterprises, Inc. v. S.E.C., 122 F.3d 93, 96 (2d Cir. 1997) (internal quotation marks omitted). Moreover, a distinction between the propriety of a court's inquiry into agency authority at the investigative stage and its inquiry into such authority at the enforcement stage makes sense given that additional facts often may be necessary to determine if a respondent is covered by a given regulation or is subject to the authority of an agency, and an administrative investigation is the process through which the agency is able to ascertain those facts. For example, the FAA might have a good-faith reason to believe that a given matter meets statutory and regulatory definitions bringing it within the FAA's authority, but additional information might be required to fully and finally determine if those definitions are met. Without allowing the FAA to serve enforceable subpoenas to obtain that information, the FAA is unable to perform its statutory obligation to regulate such matter. That scenario is akin to requiring a plaintiff to conclusively prove jurisdictional facts in litigation without allowing that plaintiff access to the discovery process to obtain the information that might be necessary to prove them. Cf. Gualandi v. Adams, 385 F.3d 236, 244 (2d Cir. 2004) ("courts generally require that plaintiffs be given an opportunity to conduct discovery on these jurisdictional facts, at least where the facts, for which discovery is sought, are peculiarly within the knowledge of the opposing party").

11

Accordingly, for the foregoing reasons, the FAA has jurisdiction to conduct an investigation into the respondents' use or operation of the relevant UAS, which falls within the agency's authority, but the court need not even reach that conclusion at this point in order to enforce the Subpoenas. Rather, the dispositive issue simply is whether the FAA's assertion of jurisdiction here is "apocryphal," which, given the statutory and regulatory language in question, it certainly is not.

## II. The Requested Documents Seek Information Concerning the Characteristics and Use of the UAS

The court next requested additional information concerning the basis for the documents requested in the Subpoenas. As a reminder, the Subpoenas requested documents for a two-year period predating the events in question which documents related to:

(1) The use of an unmanned aircraft system (UAS);
(2) The purchase and/or use of a flamethrower in conjunction with a UAS;
(3) Internet-based advertisement revenues and/or other compensation obtained by the respondents associated with uploading and/or posting UAS content to www.YouTube.com and/or other video sharing websites;
(4) The date and time of any aerial photographic and/or videography projects conducted by the respondents, using a UAS;
(5) Aerial photographic and/or videography products and/or materials and records obtained through the use or assistance of a UAS relating to any property, building, and/or site;
(6) The brand, model, description, and other identifying data concerning the UAS used for any operation identified in relation to the paragraphs set forth above;
(7) The name, address, telephone number(s), email address(es), and other contact information available of all person(s) present during the production of the following YouTube videos published to the account "Hogwit":
   a. "Flying Gun" published to YouTube on or about July 10, 2015; and

    b. "Roasting the Holiday Turkey" published to YouTube on or about December 7, 2015.

(Decl. of Brendan A. Kelly, Feb. 10, 2016, Exs. 6, 7 (Docket no. 1-3).)

Each category of documents requested in the Subpoenas is designed to obtain information regarding the characteristics of the UAS and/or the respondents' use or operation of the UAS. At the outset, a two-year period of time was selected for the document requests because that is the generally applicable statute of limitations for FAA civil penalty actions. See 14 C.F.R. § 13.208(d). The specific categories of documents requested are discussed below:

  Category 1: The FAA obviously has information that the respondents have operated at least one UAS in a manner that appears to be potentially dangerous. This request broadly seeks information in the respondents' possession concerning the use of a UAS so as to give the FAA additional information regarding the respondents' use of the UAS shown in the two videos and any historical use there might be. Information regarding the respondents' use of a UAS will assist the FAA in determining whether there has been a violation of FAA regulations (particularly with respect to careless or reckless operation of an aircraft) and also would assist the FAA in determining the scope of any such violation (determined by factors such as the specific manner of operation, the number of times the UAS was used in a particular way, the duration of such use, and whether such use was in connection with any commercial endeavor or was purely recreational).

  Category 2: This request is designed to obtain information concerning the device attached to the UAS shown in the "Roasting the Holiday Turkey" video in order to contribute to the FAA's investigation into whether the UAS use in that video was careless or reckless under 14 C.F.R. § 91.13(a).

  Category 3: This request is designed to obtain any information concerning revenue generated by the respondent(s) in connection with the two videos described in the FAA's prior memorandum. As noted above, whether an individual's use of a UAS is commercial or recreational often is an important practical distinction for FAA

|  |  |
|---|---|
|  | enforcement purposes. Because the "Roasting the Holiday Turkey" video features what appears to be some type of sponsorship and because, on information and belief, uploaded videos in certain circumstances can generate revenue for the uploader of the videos, the FAA is seeking information about any profit derived by the respondent(s) from their use of the UAS in the ways shown in the relevant videos. |
| Category 4: | This request would contribute to the FAA's understanding of the manner in which one or both of the respondents used the UAS in general and also would provide information concerning any commercial use of the UAS (aerial photography and videography being a frequent commercial use of a UAS in the FAA's experience). |
| Category 5: | The purpose of this request is the same as the purpose of request number four. |
| Category 6: | This request seeks information that may be used to identify the specific UAS used by the respondents. This information would assist the FAA in determining the scope of the respondents' use and whether such use was careless or reckless in addition to those reasons set forth in Category 1 above. |
| Category 7: | This request is designed to obtain additional information concerning other potential witnesses to the respondents' use of the UAS in the two videos, which would assist the FAA in determining whether such use was careless or reckless. In addition, this request would provide information relevant to the FAA's determination as to whether the respondents' use of the UAS endangered the life or property of another under 14 C.F.R. § 91.13(a). |

As the above indicates, the document requests contained in the Subpoenas were promulgated in good faith, they were reasonably limited, and they seek information relevant to the FAA's investigation. See Feiner v. U.S. S.E.C., 914 F. Supp. 2d 474, 478 (S.D.N.Y. 2012) (noting that "courts have defined relevance quite broadly" and holding that so long as the requested material "touches a matter under investigation," the material is sufficiently relevant). Moreover, as the FAA indicated in its previous memorandum, a

court is required to "defer to the agency's appraisal of relevancy, which must be accepted so long as it is not obviously wrong." RNR Enterprises, Inc. v. S.E.C., 122 F.3d 93, 97 (2d Cir. 1997) (internal quotation marks omitted). The FAA has made a determination of relevance in this case, and the respondents cannot meet their burden to show that compliance with the requests would create an undue burden on them. See id. ("The respondent opposing enforcement must shoulder the burden of showing that the subpoena is unreasonable or was issued in bad faith or for an improper purpose, or that compliance would be unnecessarily burdensome" (internal quotation marks omitted)).

### III. The Respondents Rebuffed the FAA's Efforts to Informally Obtain Additional Information Regarding their UAS and Indicated an Intention to Oppose the FAA's Efforts to Conduct its Investigation

Finally, the court also expressed reservations about the need for a formal deposition to obtain the requested information and therefore requested that the FAA provide information concerning any other steps short of the Subpoenas that the FAA took in an effort to obtain the requested information.

As the undersigned indicated at the March 1 hearing, the FAA first initiates contact with a person or entity that is under investigation by way of a Letter of Investigation ("LOI"), which is sent to the individual by certified mail and does not compel the individual to do anything. Rather, the LOI is designed to apprise the individual of the matter under investigation and the purpose of such investigation, to notify the individual that a response to the LOI is not required and that no adverse inference may be drawn from a refusal to cooperate, to inform the individual that information furnished in response to the LOI may be used as evidence against the

15

individual in the investigation, and to request a response from the individual with any information they might want to disclose to the FAA for purposes of the investigation.

On August 20, 2015, the FAA sent a LOI to Austin Haughwout (copy attached as Exhibit 5.)  The LOI included the information described above and indicated that the FAA was investigating his operation of the UAS in the "Flying Gun" video.  On December 22, 2015, the FAA sent another LOI to Austin Haughwout (copy attached as Exhibit 6).  That LOI also included the information described above and indicated that the FAA was investigating his operation of the UAS in the "Roasting the Holiday Turkey" video.  Both LOIs also stated:

> We would appreciate receiving any evidence or statements you might care to disclose regarding this incident within ten days of receipt of this letter.  Any discussion and/or written statements furnished by you will be given consideration in our investigation.

Austin Haughwout chose not to respond to either LOI or voluntarily provide any information regarding the matters under investigation.  That was obviously his right (as the LOIs made clear), but his refusal to voluntarily respond to the LOIs necessitated further action by the FAA in order to conduct its investigation into the respondents' conduct.[6]  As such, the FAA exercised its statutory authority to issue initial subpoenas to the respondents' compelling their attendance at the FAA's offices in Burlington, Massachusetts.  In response to those subpoenas, Bret Haughwout spoke on two occasions

---

[6]The petitioner acknowledges that the FAA did not send an LOI to Bret Haughwout because the information available at the time indicated that Austin Haughwout was the creator and primary operator of the UAS.  Given, however, that the respondents are father and son and that Bret Haughwout had given public statements concerning Austin Haughwout's use of the UAS, the FAA made the reasonable decision to issue the Subpoenas to both respondents after Austin Haughwout failed to respond to the LOI.

with counsel in the FAA Enforcement Division and indicated that neither he nor his son would comply with the subpoenas in question. He followed up those conversations with an email to the FAA in which he made clear the respondents' position on furnishing information to the FAA.[7] Specifically, he indicated his belief that "appearing under the administrative subpoena is consenting to a search of any documents I provide" and that he had "been advised by legal counsel . . . to not consent to any searches." (Kelly Decl., Ex. 3.) The email further reflected his position that the FAA could only obtain the requested material with a "proper subpoena" and only "in discovery if the matter is litigated." (Id.) Finally, Mr. Haughwout stated his intention to "comply to the extent required by law." (Id.)

Subsequently, the FAA issued new subpoenas to the respondents requiring their attendance at the United States Attorney's Office in New Haven, Connecticut. This was not done in an effort to intimidate the respondents, but rather because this location – only 26 miles from the respondents' home in Clinton, Connecticut – presumably would be more convenient for them, and even though not previously raised by the respondents, the FAA did not want the distance between the respondents' residence and the place of compliance to create a burden that might raise an issue to enforcement of those subpoenas. After the issuance of those subpoenas, counsel for the FAA spoke again with Bret Haughwout, who reiterated that the respondents would not comply with the FAA's

---

[7] In the email, Bret Haughwout also made certain inaccurate claims regarding the authority of the FAA and requirements concerning the FAA's investigatory authority. The FAA disagrees with those assertions for all of the reasons set forth in its papers, but those portions of Mr. Haughwout's email are not relevant to the court's inquiry as to the FAA's previous efforts to obtain information from the respondents.

17

requests for information and stated that he would attempt to quash the subpoenas if the FAA petitioned the court for enforcement and would appeal any enforcement order issued by the court.  (See Memo to File, Record of Telephone Conversation between M. Zappala and B. Haughwout, Nov. 30, 2015, attached hereto as Exhibit 7.)

Finally, the FAA served the operative Subpoenas to seek additional information concerning the "Roasting the Holiday Turkey" video, which only had come to light after the issuance of the second subpoenas, and to make a record of the respondents' noncompliance in anticipation of filing this petition to enforce.  As before, the Subpoenas were not served to harass or intimidate the respondents but were issued to ensure both that the scope of the requested discovery included the conduct shown in the second video and that the court would have sufficient evidence of noncompliance to issue an order mandating compliance with the Subpoenas.

As such, the FAA's conduct in this case was appropriate under the circumstances and its tactics in attempting to obtain the information necessary for its investigation were not unduly aggressive.  To the contrary, the FAA first attempted to obtain that information voluntarily, and Austin Haughwout did not respond to that request. Subsequently, the respondents' provided an affirmative indication that they would not furnish any information voluntarily, and the FAA proceeded to schedule depositions in a manner convenient for the respondents and to make a record of any noncompliance in anticipation of a possible petition to enforce the Subpoenas.  The FAA vehemently denies that it was unwilling to work cooperatively with the respondents to obtain the information necessary for the FAA's investigation, and as the record indicates, the respondents very

clearly indicated an unwillingness to voluntarily produce any information, instead stating that they intended to fight the FAA every step of the way. Unfortunately, then, court intervention was and remains necessary to enforce the Subpoenas, which were properly issued pursuant to the FAA's investigatory authority.

**IV.     Conclusion**

The statutory scheme underlying the FAA's authority and the FAA's regulatory scheme unambiguously reach the respondents' use and operation of the UAS at issue in this case, and even if there were an ambiguity, it would be resolved in favor of the FAA's interpretation as a matter of administrative deference. Moreover, the court need not even resolve the question of authority at the investigative stage, when the FAA has not yet levied a penalty against the respondents and before the FAA even has had the opportunity to obtain any information from the respondents, some of which might bear on the authority question itself.

The documents requested and the testimony that the FAA would elicit at a deposition are designed to obtain information from the respondents concerning their use and operation of the UAS in question, including characteristics of the UAS itself. The document requests are reasonably circumscribed, they are not unduly burdensome, and they seek information relevant to the FAA's investigation.

The Subpoenas are the only way to obtain the information requested given Bret Haughwout's previous statements to the FAA that he intended to contest the FAA's attempts to obtain information from the respondents, including by refusing to comply with the Subpoenas, planning to move to quash them in court, and appealing any order

19

enforcing them.  Before even issuing the Subpoenas, the FAA requested information from Austin Haughwout informally and received no cooperation.  Unfortunately from the FAA's perspective, it had to issue the Subpoenas and to bring this action to enforce them, but without a voluntary response to the LOI, the FAA had no other choice in conducting its investigation.

In sum, the Subpoenas meet the Second Circuit's four-factor test as described in the FAA's original memorandum, and there are no countervailing considerations that should give the court pause in granting the FAA's petition.  The FAA therefore respectfully urges the court to issue an order enforcing the Subpoenas.

        Respectfully submitted,

        DEIRDRE M. DALY
        United States Attorney

          /s/ John W. Larson
        John W. Larson (ct28797)
        Assistant United States Attorney
        United States Attorney's Office
        District of Connecticut
        157 Church Street, 25th Floor
        New Haven, CT 06510
        Tel: 203-821-3700
        Fax: 203-773-5373
        john.larson@usdoj.gov