## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

MICHAEL HUERTA                     :
                                   :     Case No. 3:16-cv-358 (JAM)
v.                                 :
                                   :
AUSTIN HAUGHWOUT et al.            :     May 11, 2016

## RESPONDENTS' MEMORANDUM IN OPPOSITION TO PETITION FOR ENFORCEMENT OF ADMINISTRATIVE SUBPOENA[1]

In response to the subpoenas, petition to enforce, and memoranda of law filed by the petitioner, Michael Huerta, Administrator of the Federal Aviation Administration (FAA), the respondents, Austin and Bret Haughwout (the Haughwouts) submit this memorandum of law in opposition to the petition. Enforcing the petition violates the prohibition against unreasonable searches and seizures. This conclusion rests on two principles.

First, the investigation to which the subpoenas are directed is beyond the FAA's statutory and regulatory authority. The FAA investigation rests on an unreasonable construction of "aircraft." Accordingly, the subpoenas are an unreasonable exercise of authority, violating the Fourth Amendment, and this Court should not enforce them.

Second, the subpoenas are unconstitutional as-applied. Even if the Court concludes the FAA's interpretation of its authority is appropriate, the government's action in the present case exceeds the permissible scope of the Commerce Power and infringes on state sovereignty in violation of the Tenth Amendment. *See United States v. Morrison*, 529 U.S. 598 (2000); *United States v. Lopez*, 514 U.S. 549 (1995). Subpoenas issued pursuant to an unconstitutional end are not reasonable searches or seizures, and this Court should not enforce them.

---

[1]The Haughwouts respectfully direct the Court's attention to a pending case that may present legal questions similar to those in this case, *John Taylor v. Michael Huerta*, Case No. 15-1495 (D.C. Cir.).

## FACTUAL AND PROCEDURAL BACKGROUND

The Haughwouts generally do not quibble with the background as recited by the FAA.
See Petitioner's Memorandum, ECF No. 1 (Pet. Mem.) at 1–4.  In the second half of 2015, the
FAA became aware of evidence that Austin Haughwout modified several devices and published
video on the Internet of these devices in action.  The devices are colloquially known as "drones;"
the FAA describes the devices in the videos as unmanned aircraft systems (UAS).

One video depicts a drone in a low hover discharging a handgun. *See* "Flying Gun,"
available at https://www.youtube.com/watch?v=xqHrTtvFFIs. Another depicts a drone in a low
hover discharging flames at a turkey—or what sometime had been a turkey—charred on a large
spit. *See* "Roasting the Holiday Turkey," https://www.youtube.com/watch?v=lmD3rXUR1Tw.
The videos were tremendously popular on YouTube:  the former has accumulated more than 3.5
million views, and the latter has accumulated more than 500,000 views.  In both instances, the
devices move no higher than about shoulder height and are depicted in an open space within a
larger wooded area of moderate density.

After an investigation by local authorities, no action was taken.  A state law was
proposed in response to the incident, but was not passed this legislative session. *See* Substitute
for Raised H.B. No. 5274, (status of bill) available at
https://www.cga.ct.gov/asp/cgabillstatus/cgabillstatus.asp?selBillType=Bill&which_year=2016
&bill_num=5274; *see also* Ex. A.

The FAA opened an investigation, and then it issued subpoenas to the Haughwouts on
November 5, 2015; November 24, 2015; and December 17, 2015.  The Haughwouts indicated
they would not comply with the subpoenas unless compelled to do so by a court order and did
not appear for any of them.

On February 11, 2016, the FAA filed a petition with this Court to enforce the subpoenas and also filed an accompanying memorandum of law.  The FAA claimed that it was investigating a potential violation of 14 C.F.R. § 91.13, which prohibits operation of "an aircraft in a careless or reckless manner so as to endanger the life or property of another."  *See* Pet. Mem. 6.

On March 1, 2016, the Court conducted a hearing on the matter.  Among other things, the Court ordered supplemental briefing from the FAA. On March 22, the FAA filed its supplemental brief. This memorandum followed.  Further facts and procedural history are set forth as necessary.

## RELEVANT LEGAL STANDARDS CONCERNING ADMINISTRATIVE SUBPOENAS

### A.  Generally

The constitutional requirements of administrative subpoenas are well established.  The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

"Leaving enforcement to the courts indicates that Congress intended that **judges should not merely rubber-stamp** the [administrative] subpoenas that come before them. . . .  But, while a district court's enforcement function is neither minor nor ministerial . . . it is well established that it is a narrowly limited one . . . ."  *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1266 (7th Cir. 1982) (citations omitted; emphasis added; internal quotation marks omitted).  Whether an administrative subpoena is constitutionally sound turns on inquiries concerning *reasonableness*. "The gist of the [Fourth Amendment] protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable."  *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208, 66 S. Ct. 494 (1946), *accord Donovan v. Lone Steer, Inc.*, supra, ("[o]ur holding here .

. . simply reaffirms our holding in *Oklahoma Press*"); *see also In re McVane*, 44 F.3d 1127, 1136 (2d Cir. 1995) (explicitly relying on this section of *Oklahoma Press*).

There are a number of "minor linguistic variations" in how the Supreme Court articulates tests of reasonableness; *In re McVane*, 44 F.3d 1127, 1135 (2d Cir. 1995); but reasonableness is consistently the polestar for the inquiry.  "[I]t is sufficient if [1.] the inquiry is *within the authority of the agency*, [2.] the demand is not too indefinite and [3.] the information sought is reasonably relevant." *Id.*, (emphasis added).  Further requirements include that "[4.] the information sought is not already within the [agency's] possession" and that "[5.] the administrative steps required . . . have been followed." *United States v. Stuart*, 489 U.S. 353, 359 (1989).  The Haughwouts direct their opposition mainly at the issue of authority.

### B.  Scope of Authority

Before enforcing an administrative subpoena, "a court must assure itself that the subject matter of the investigation is within the statutory jurisdiction of the subpoena-issuing agency." *F.T.C. v. Ken Roberts*, 276 F.3d 583, 586–87 (D.C. Cir. 2001) (internal quotation marks omitted.); *F.E.C. v. Machinists Non-Partisan Political League*, 655 F.2d 380, 386 (D.C. Cir. 1981) (citing copious authority).  If the subpoenas are issued pursuant to an improper investigative purpose, the court should deny the petition.  *See United States v. LaSalle Nat. Bank*, 437 U.S. 298, 313–14 (1978); *see also Burlington N. R.R. Co. v. Office of the Inspector Gen., R.R. Retirement Bd.*, 983 F.2d 631, 641 (5th Cir. 1993) (denying enforcement of administrative subpoena because agency lacked authority to conduct compliance enforcement); *E.E.O.C. v. Am. & Efird Mills, Inc.*, 964 F.2d 300, 304 (4th Cir. 1992) (noting denial of enforcement of administrative subpoena is appropriate where agency exceeds its authority).  Scope of agency authority in this context is a legal question.  *See Burlington N. R.R. Co. v. Office of the Inspector*

4

*Gen., R.R. Retirement Bd.*, supra, 983 F.2d 641.  "[A] court may not permit its process to be abused."  *United States v. LaSalle Nat. Bank*, supra, 437 U.S. 314.

"The [target of an investigation] should not be burdened with having to comply with a subpoena if . . . the district court believe[s] the agency issuing it has no jurisdiction to regulate the [matter].  Questions of regulatory jurisdiction are properly addressed at the subpoena-enforcement stage if . . . they are ripe for determination at that stage. . . .  Compliance with a subpoena is a burden, and one that a person or institution that can show it is not subject to the regulatory regime in aid of which the subpoena was issued should not be required to bear."  *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490, 492 (7th Cir. 1993) (citing copious authority).

### C.  The FAA overstates how much the Court "must" defer to it

The FAA contends that the "the court **must** defer to the FAA's exercise of authority over the UAS at this investigatory stage because the exercise of such authority is not frivolous . . . ."[2] Pet. Supp. Mem. 1, 10–12 (emphasis added).  The FAA's position is essentially that it enjoys carte blanche investigatory power over whatever it considers to be an aircraft, and that the Court ineluctably must adopt the FAAs construction of its jurisdiction or authority.

The FAA overstates the case.  Rather, consonant with the Fourth Amendment, the question fundamentally remains a reasonableness inquiry.  The standard is deferential, but it is not as feckless as the FAA maintains.  As discussed in greater detail below, the FAA's construction is so absurd that it fails even the most charitably deferential standards of review.

---

[2]The FAA's position is not frivolous.  The FAA is, however, obviously wrong.  See note 6 of this memorandum, infra.

**D.   The FAAs cited authority concerning scope of authority is distinguishable or inapposite**

The Haughwouts now in seriatim distinguish or clarify each of the authorities cited by the

FAA on pages 10-12 of its supplemental memorandum concerning this issue.

1.   Construction Products Research, Inc.

The FAA cites *United States v. Construction Products Research, Inc.*, 73 F.3d 464 (2d

Cir. 1996) for the proposition that "[a]t this stage in the proceedings, courts need not determine

whether the subpoenaed party is within the agency's jurisdiction or covered by the statute it

administers" and that "the coverage determination should wait until an enforcement action is

brought against the subpoenaed party."[3]  *Id.*, 470 (internal quotation marks omitted).

The background to *Construction Products Research* is an investigation by the Nuclear

Regulatory Committee (NRC) into three related companies.  During this initial investigation, the

---

[3]Putting the FAA's citations in context, the panel noted at 470–71:

> *Endicott Johnson* was a watershed in administrative investigations.  It was now established that an agency could conduct an investigation even though it had no probable cause to believe that any particular statute was being violated. . . .  Indeed, an administrative agency, like a grand jury, could now investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. . . . Moreover, at the subpoena enforcement stage, courts need not determine whether the subpoenaed party is within the agency's jurisdiction or covered by the statute it administers; rather the coverage determination should wait until an enforcement action is brought against the subpoenaed party. . . .
> This is not to say that an agency may conduct any investigation it may conjure up; the disclosure sought **must always be reasonable**. . . .  This limitation of reasonableness is satisfied [s]o long as an agency establishes that an investigation will be conducted pursuant to a **legitimate purpose**, that the inquiry may be relevant to the purpose, that the information sought is not already within [its] possession, and that the administrative steps required . . . have been followed.

(Citations omitted; emphasis added; internal quotation marks omitted.)  The FAA's construction of the standard cannot be squared with the analysis the panel actually engaged in.

whistleblower who initiated the process was terminated.  He subsequently brought a claim with the Department of Labor (DOL) for retaliation.  The NRC, though, was concerned that past treatment of whistleblowers by the three companies posed a threat to public health.  So the NRC opened a second investigation and issued subpoenas to the respondent employers concerning whistleblowers.

These subpoenas were litigated in *Construction Products Research*.  The object of the subpoenas were employment documents concerning whistleblowers. *Id.*, 468.  The employers claimed the subpoenas were beyond the NRC's authority, and that only the DOL had such power.  On appeal, the Second Circuit panel disagreed.

The panel engaged in a substantive analysis of whether the investigation fell within the authority of the NRC. *Id.*, 471-73.  Notwithstanding whatever quotes the FAA teases out in its memorandum, the panel closely examined the language forming the statutory and regulatory bases for the investigation.  The analysis was substantive, not superficial.  The panel fundamentally determined whether "the NRC has the authority to conduct this particular investigation and to obtain the information sought by the subpoena." *Id.*, 473.

Here, the FAA's position is that the analysis that the Second Circuit actually engaged in is inappropriate.  The Haughwouts are asking this Court to engage in a review similar to that which the panel engaged in.

What distinguishes the present case from *Construction Products Research* is that in that case, there was no question as to the scope of the NRC's own organic statute—the main question was about overlapping jurisdiction, and whether one agency or another had jurisdiction.  The meaning of the organic statute of the NRC was reviewed but not an especially contentious matter.

In contrast, the present case is directly concerned with the scope of the authority conferred on the FAA by its organic statute.  This is a matter of first impression for an Article III court.  As discussed below, the statute is ambiguous, and the agency's construction is absurd.  This is not a question of overlapping jurisdiction—the matter here is more fundamental than the issues presented in *Construction Products Research*.

2.  <u>Ken Roberts Co.</u>

The FAA relies on *F.T.C. v. Ken Roberts*, 276 F.3d 583 (D.C. Cir. 2001).  The passage cited is that "courts of appeals have consistently deferred to agency determinations of their own investigative authority, and have generally refused to entertain challenges to agency authority in proceedings to enforce compulsory process."[4]  *Id.* at 586.

The issue in *Ken Roberts* was whether the FTC's jurisdiction was preempted by the passage of several laws—not unlike *Construction Products Research*.  On appeal, the panel

---

[4]Putting the FAA's citations in context, the panel noted at 585–87:

> Following *Endicott*, courts of appeals have consistently deferred to agency determinations of their own investigative authority, and have generally refused to entertain challenges to agency authority in proceedings to enforce compulsory process. . . .
>
> Subpoena enforcement power is not limitless, however. In *United States v. Morton Salt* . . . the Court emphasized that a subpoena is proper only where the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.  Accordingly, there is no doubt that a court asked to enforce a subpoena will refuse to do so if the subpoena exceeds an express statutory limitation on the agency's investigative powers. . . .  Thus, **a court must assure itself that the subject matter of the investigation is within the statutory jurisdiction of the subpoena-issuing agency**. . . .  These cases amply demonstrate that while the courts' role in subpoena enforcement may be a strictly limited one, it is neither minor nor ministerial. . . .
>
> In adhering to the foregoing principles, we have held that enforcement of an agency's investigatory subpoena will be denied only when there is a patent lack of jurisdiction in an agency to regulate or to investigate. . . .

(Citations omitted; emphasis added; internal quotation marks omitted.)

inquired whether the new statutes "evince an unambiguous intent to deprive the FTC of its otherwise applicable authority . . . ." The panel engaged in a lengthy analysis of the relevant statutes and legislative history. *Id.*, 585–93. That is, the panel "assure[d] itself that the subject matter of the investigation [wa]s within the jurisdiction of the subpoena-issuing agency." *Id.*, 586.

The hallmark of the jurisdictional analysis was *reasonableness*: "Because under no reasonable reading . . . does either of those statutes manifestly strip the FTC of its broad power over deceptive advertising, we affirm the District Court's decision that appellants must comply with the FTC's compulsory process." *Id.*, 584. In the present case, the Haughwouts are asking the Court to engage in the same kind of assessment of reasonableness of the claimed authority.

Like *Construction Products Research*, what distinguishes *Ken Roberts* from the present case is that *Ken Roberts* principally concerned which agency held jurisdiction. Unlike the present case, there was not a serious question presented as to the fundamental meaning an agency's organic statute.

### 3. Sturm, Ruger & Co.

The FAA relies on *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5-6 (1st Cir. 1996) for the proposition that "[a]s long as the agency's assertion of authority is not obviously apocryphal, a procedurally sound subpoena must be enforced." In *Sturm*, OSHA was investigating a company where an unusually high number of employees were afflicted with multiple movement disorders. *Id.*, 3. OSHA issued subpoenas pursuant to the investigation, which the company challenged. *Id.*

The company employed a kind of scattershot defense to the subpoenas, which proved wildly unsuccessful. Among other things, the company claimed OSHA lacked the authority in

its organic statute to issue the subpoenas.  *Id.*, 4–5.  The reviewing court concluded it was

"apodictic" that OSHA had such authority.  *Id.*, 5.  This is what distinguishes the present case.

The matter here is a question of first impression.  Unlike OSHA's authority in *Sturm*, the

definition of aircraft upon which the FAA relies is not clearly established or beyond dispute.

Here, it is an open and unsettled question and merits review.

### 4.  Beacon Aerospace Corp.

The FAA relies on *United States v. Beacon Aerospace Corp.*, No. 3:99-MC-146 (D.

Conn. Jan. 11, 2000) (2000 WL 92350).  The petition to enforce the administrative subpoena in

that case was dismissed as moot:  "Without determining whether [Beacon's] surrender of its

certificate removes it from FAA regulatory oversight, the court concludes that [the court] lacks

jurisdiction to rule on this petition to enforce the subpoena."  *Id.*, *2.  The opinion provides some

useful citations, but ultimately it is a case about mootness, not whether the FAA had the

authority to issue an administrative subpoena.

### 5.  Civil Procedure

On pages 11–12 of its supplemental memorandum, the FAA imports a principle from

civil procedure—that denying enforcement "is akin to requiring a plaintiff to conclusively prove

jurisdictional facts in litigation without allowing that plaintiff access to the discovery process to

obtain the information that might be necessary to prove them."  An analogy to civil procedure is

appropriate.  But denying enforcement here is more akin to a common law demurrer or a

12(b)(6) motion:  upon reviewing the statutes, the FAA has failed to state a claim upon which

relief can be granted.  Accordingly, the FAA is not entitled to burden the Haughwouts with the

"discovery" process—the administrative subpoena.  The FAA's claim is unavailing.

6.   Other Cases Cited in this Section

The FAA mentions a few other cases on pages 10–12 of its supplemental memorandum.
These cases are cited generically, for persuasive-but-not-on-point language, and accordingly they
are not addressed in detail.

**E.  The present case concerns a fundamental question of scope of authority like in
*Truckers United for Safety* and *Burlington Northern Railroad***

In both *Burlington N. R.R. Co. v. Office of the Inspector Gen., R.R. Retirement Bd.*,
(*Burlington*) 983 F.2d 631, 641 (5th Cir. 1993) and *Truckers United for Safety v. Mead*,
(*Truckers United*) 251 F.3d 183 (D.C.Cir.2001), a Circuit Court of Appeals panel concluded that
granting an administrative subpoena was improper because the subpoena exceeded the agency's
scope of authority.  Like the present case, both of those cases concerned a matter where there
was a genuine question as to the scope of an investigative agency's jurisdiction.

In *Burlington*, an Inspector General had been accorded oversight powers, but not
regulatory powers.  The Inspector General conducted a review of taxes paid by certain railroads.
The work was somewhat duplicative of work done by the IRS, but the Inspector General detected
irregularities that went undetected by the IRS and the Railroad Retirement Board (which itself
relied on the IRS).  In light of the irregularities, the Inspector General issued subpoenas, which
were challenged.  The district court conducted a lengthy and detailed inquiry into whether the
Inspector General had the power to conduct such an investigation—whether the Inspector
General's investigation would be defined as regulatory or as oversight.  This was apparently a
matter of first impression.  Ultimately, the investigation was defined as regulatory in nature, and
therefore beyond the powers of the Inspector General.  The administrative subpoenas were not
enforced.

11

*Truckers United* also concerned an Inspector General and the scope of authority accorded by its three-year old organic statute.  In that case, administrative subpoenas were challenged and the companies investigated refused to comply.  A warrant was obtained and the companies were forced to comply, ahead of judicial oversight.  Post-hoc, it was determined that the administrative subpoenas were unenforceable because the Inspector General did not have authority to conduct the investigations, and that the administrative subpoenas should not have been enforced through the warrants.

Note that this was all before the enforcement stage of the investigations.  The challenge to the warrant and subpoenas did not occur at the merits stage of the investigation, but in a proceeding in the immediate wake of the warrants.  The statute was relatively new and did not have extensive jurisprudence around it—the question of authority was genuine.

Like both *Burlington* and *Truckers United*, the present case concerns a matter that has not been litigated before.  There is a genuine question as to the authority of the FAA in this context—the FAA does not have an extensive history of enforcement actions against drone operators.  Accordingly, review of the FAA's claimed authority, however deferential, is appropriate.

**DISCUSSION**

## I.   THE INVESTIGATION IS BEYOND THE STATUTORY AND REGULATORY AUTHORITY OF THE FAA

In its supplemental memorandum, the FAA states that it relies on its organic statute for its authority over the investigation.  See Pet. Supp. Mem. 3–4.  The FAA relies on 49 U.S.C. §§ 40102(a)(6) and 40103(b).  The sections cited state, in relevant part:

§40102(a)[5]
(6) "aircraft" means any contrivance invented, used, or designed to navigate, or fly in, the air.

§ 40103(b)
(1) The Administrator of the Federal Aviation Administration shall develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace.

(2) The Administrator shall prescribe air traffic regulations on the flight of aircraft (including regulations on safe altitudes) for . . .
   (A) navigating, protecting, and identifying aircraft;
   (B) protecting individuals and property on the ground;
   (C) using the navigable airspace efficiently; and
   (D) preventing collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

The Pilot/Controller Glossary defines national airspace system as:

The common network of U.S. airspace; air navigation facilities, equipment and services, airports or landing areas; aeronautical charts, information and services; rules, regulations and procedures, technical information, and manpower and material. Included are system components shared jointly with the military.

Pilot/Controller Glossary, PCG N-1 (2014) (Ex B.). In other words, the National Airspace

System concerns air traffic. *See* National Airspace System, https://www.faa.gov/air_traffic/nas

(accessed May 7, 2016); National Airspace System,

https://en.wikipedia.org/wiki/National_Airspace_System (accessed May 7, 2016).

### A. The Subpoena Rests on an Unreasonable, Patently Absurd, Obviously Wrong, Clearly Incorrect Construction of "Aircraft"[6]

---

[5]The FAA parrots this definition in 14 C.F.R. § 1.1, which defines an aircraft as "a device that is used or intended to be used for flight in the air."

[6]The subpoena is *not*, however, frivolous. The FAA implicitly equates "obviously wrong" and "patently incorrect" and the like with "frivolous" in its supporting memorandum. This is misleading.

A claim can be obviously wrong and patently incorrect yet non-frivolous. For example, a Supreme Court majority might conclude that a colleague on the court is "obviously wrong" on a point of law in his or her concurring opinion. Future attorneys might, in time, rely on that concurring opinion in making a legal claim. Under prevailing law, such a claim would be

The present case is one of first impression—no Article III Court has had occasion to examine the scope of the term "aircraft" as used in the FAA organic statute or 14 C.F.R. § 1.1. The statutory definition of aircraft is ambiguous, and the FAA's construction is patently absurd. Sure, §40102(a)(6) and 14 C.F.R. §1.1 *looks* simple enough. A thing, any thing, that flies.

The verb fly, as in "fly in the air," is not so plain, though. There is fly in the sense of airborne locomotion, like how birds fly from one place to another. But . . . flags also fly, when attached to a pole, don't they? We also say that plastic bags or bits of paper carried on the air fly about—isn't that a motif in *American Beauty*? And don't we say that bullets or knives or any airborn dangerous object—don't they fly through the air too, especially when there are lots of them? Baseballs can go pretty high—we call it a "fly ball." Okay.

For the sake of the argument, let's imagine the "airborne locomotion" definition is the only one. That leaves . . . Frisbees. Clay pigeons. Paper airplanes. A pole for pole vaulting. A good pair of basketball sneakers. A rubber band. Spitballs. Anything juggled. A birthday balloon. Hand tossed pizza dough. Ceramic plates during a lovers' spat. Genetically engineered fruit flies, bacteria, pollen. Alright, alright.[7]

---

"obviously wrong," but the claim would not be frivolous. It is improper to elide the standards of "obviously wrong" or "patently incorrect" with "frivolous."

Frivolous claims are subject to Rule 11 sanctions, and cannot reasonably be made in good faith. A better analogy to these phrases indicating deference is something like abuse of discretion—that no reasonable jurist could come to the same conclusion. This is consistent with the ever present hallmark of reasonableness in the inquiry.

[7]The FAA refers to line from *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5-6 (1st Cir. 1996), that "so long as the agency's assertion of authority is not obviously apocryphal, a procedurally sound subpoena must be enforced." *See* Pet. Supp. Mem. 10, 12. Notwithstanding the ornamental language, it is not clear what constitutes "apocrypha" in our especially secular legal system. However, the FAA's construction of "aircraft" is so far from acceptable canons of construction that it is safely regarded as heretical pseudepigrapha.

Claiming that the statute is unambiguous *requires* accepting all of these as aircraft. Claiming that only the plain language governs *requires* accepting all of these as aircraft. The FAA recognizes the absurdity. So in note 1 of its memorandum, it conjures constraints that are not in the statutory or regulatory definition to try to cabin the definition: an object that is "self-propelled and capable of causing injury of person or property – is well within that boundary."

But this Hail Mary pass is equally ineffective. How about a bullet? It's self-propelled with gunpowder and capable of causing injury. The FAA regulates bullets? Additionally, where exactly does this narrowing language come from? The FAA provides no citation in note 1. It certainly doesn't come from 49 U.S.C. §40102(a)(6) or 14 C.F.R. §1.1, anyhow. The addition begs the question—if the statute is so plain, why is this language even necessary for the FAA's argument?

In the next iteration of this strategy, will the FAA add "sustained flight," a phrase mentioned in another context in the FAA Modernization and Reform Act of 2012 (P.L. 112-095)? Well then how long is "sustained"—every aircraft must land eventually, even if that's in a crash.

In *Huerta v. Pirker*, Docket No. CP-217 (N.T.S.B. Mar. 6, 2014) (*Pirker I*), the honorable Patrick A. Geraghty[8], Administrative Law Judge to the National Transportation Safety Board, said it best:

> Accepting [the FAA's] overreaching interpretation of the definition of "aircraft" would result *reduction ad [a]bsurdum* in assertion of [Federal Aviation Regulations] regulatory authority over any device/object used or capable of flight in the air, regardless of method or propulsion or duration of flight.

---

[8]Judge Geraghty passed away February 6, 2016. He was 82. *See* "Patrick G. Geraghty" (accessed May 10, 2016) http://www.forevermissed.com/patrick-geraghty/#about.

*See Pirker I*, 7 n.24.  Judge Geraghty also wisely pointed out that the FAA's own scheme implicitly recognizes that the definition of "aircraft" is not what the plain language of the statute or 14 C.F.R. §1.1 because "ultralights" are not "aircraft."

> An Ultralight, a device used for flight in the air, is nevertheless governed by the provisions of Part l03 [Federal Aviation Regulations], and whereupon meeting the criteria stated in Section 103.1 is defined, not as an "aircraft", but as an "Ultralight Vehicle", subject only to the particular regulatory provisions of Part 103,[Federal Aviation Regulations].

*Pirker I*, 4.  At the time the FAA organic statute was created, drones were the stuff of science fiction.  The statute did not contemplate their existence.  Rather, the statute was directed at airplanes, helicopters, and blimps, and the resources on the ground to support them.

The level of absurdity in the FAA's construction and the playing so fast and loose with the language in the FAA's argument is classically arbitrary or capricious in substance, and improper under *any* level of deference—*Chevron*, *Skidmore*, and *Auer*.  The definition of aircraft is ambiguous because the plain language leads to absurd results.  The FAA's construction is obviously wrong and unreasonable.  A subpoena pursuant to an obviously wrong statutory construction is not a reasonable exercise of authority, and the Court should not grant a petition to enforce such an unreasonable exercise of authority.

**B.  *Pirker II* has been widely criticized and was wrongly decided, and the FAA's reliance on it here is misplaced**

On pages 4–7 of its supplemental memorandum, the FAA relies heavily on *Huerta v. Pirker*, Docket No. CP-217 (N.T.S.B. Nov. 17, 2014) (*Pirker II*).  *Pirker II* has been thoroughly criticized by the nascent community of drone legal scholarship and others, whereas Judge Geraghty's opinion in *Pirker I* was widely praised.[9]  Undersigned counsel was unable to find any

_____

[9] The following serves as a non-exclusive list of helpful examples, listed in an order approximating perceived usefulness:

articles praising *Pirker II* or criticizing *Pirker I*; the uniformity of opinion is stark.  (Undersigned

counsel notes he did come across a few articles that took a normative approach and that did not

express an opinion one way or the other.)

Pirker II is an outcome-oriented decision, necessitated by the FAA's failure to keep to

the timeline congress set in the FAA Modernization and Reform Act of 2012 (P.L. 112-095).

---

- Peter Sachs, subheading: "The Pirker Case," Drone Law Journal (Published Dec. 14, 2013; Revised Dec. 25, 2015) http://dronelawjournal.com/ (praising *Pirker I* as "well-reasoned, logical and scathing" and criticizing *Pirker II*, noting that "even paper airplanes are now subject to FAR 91.13").

- Staff, "The Meaning of Yesterday's NTSB Ruling" dronelaw.com (Nov. 19, 2014) http://dronelaw.com/2014/11/19/meaning-yesterdays-ntsb-ruling/ ("We also think [*Pirker II*] stands on shaky ground, and could be vulnerable on review by an Article III court.").

- Gregory S. McNeal, "The Federal Government Thinks Your Backyard Is National Airspace And Toys Are Subject To FAA Regulations" Forbes (Nov. 18, 2014) http://www.forbes.com/sites/gregorymcneal/2014/11/18/the-federal-government-thinks-your-backyard-is-national-airspace-and-toys-are-subject-to-faa-regulations/#4e27c6ac7ab4 (mocking *Pirker II* as absurd).

- Megan Ralstin, "Why the FAA Drone Policies Are So Awful" Art Law Journal (Nov. 23, 2014) http://artlawjournal.com/faas-drone-policies-awful/ (criticizing *Pirker II*).

- Alan Levin, "Commercial Drone Pilots Cheer Judge Finding Against FAA" Bloomberg (Mar. 7, 2014) http://www.bloomberg.com/news/articles/2014-03-06/drone-pilot-s-fine-dropped-by-judge-finding-against-faa (noting widespread praise for *Pirker I*).

- Elizabeth Kreft, "Commercial Drone Industry 'Elated' After Judge Drops FAA's Case" The Blaze (Mar. 7, 2014) http://www.theblaze.com/stories/2014/03/07/commercial-drone-industry-elated-after-judge-drops-faas-case/ (noting widespread praise for *Pirker I*).

- Ryan Calo, "FAA Appeals Drone Decision," Center for Internet and Society (Mar. 13, 2014) http://cyberlaw.stanford.edu/publications/faa-appeals-drone-decision (questioning soundness of an appeal by the FAA from *Pirker I*).

- Wingedaeronaut, "Praise and Criticism for the FAA," The Drone Perspective (Feb. 28, 2016) https://thedroneperspective.wordpress.com/2016/02/28/praise-and-criticism-for-the-faa/ (noting that *Pirker II* demonstrated FAA inconsistency in the definition of aircraft).

*Pirker II* makes no attempt to cabin the broad definition of aircraft; it embraces it, holding that the Administrator can pick and choose what to regulate. *Pirker II* 7. Accordingly, *Pirker II* rests on the same flawed construction of aircraft discussed in the preceding section. The Court should not place its imprimatur on *Pirker II* or its unreasonable definition of aircraft.

## C. Small civilian drones are not "aircraft" under 49 USC §40102(a)(6) and 14 C.F.R. §1.1

For the purposes of this petition, it is not necessary to determine exactly what the proper definition of an aircraft is. It is sufficient to determine whether the devices depicted in the video are reasonably construed to be aircraft. Examining the policy underlying that definition and the historical context indicates that the devices as used in the videos are not aircraft as contemplated by the statute.

Congress laid out policy considerations for the FAA organic statute in 49 U.S.C. §40101. Reviewing that statute shows that the FAA's purpose is directed at air commerce for the nation as a whole. The safety interest discussed in §40101 is first and foremost directed at air commerce, and then air transportation services and the traveling and shipping public. The statute is concerned with encouraging competitive markets, encouraging air transportation, air carriers, air cargo, mail, and the working conditions in the air commerce industry. It's about commerce at the national level.

Nothing in §40101 evinces a concern for what people do in their back yard at ground level under a forested canopy, away from any air infrastructure. Thus, the FAA does not have an extensive history of enforcement actions against operators of small civilian drones. It's not what their policy as set by Congress directs them to do. Construing small civilian drones as aircraft is not consonant with the history and policy purpose of the FAA. It was about airplanes, helicopters, and blimps, and the accoutrements that accompany them.

## II. THE GOVERNMENT ACTION IS OUTSIDE THE SCOPE OF THE COMMERCE CLAUSE AND UNCONSTITUTIONAL UNDER THE TENTH AMENDMENT

If the Court should conclude that the FAA's construction of "aircraft" is reasonable, the Haughwouts present a constitutional argument as an alternative ground to deny enforcement of the subpoenas. The FAA alleges that the subpoenas are issued pursuant to investigating potential violations of 14 C.F.R. §91.13[10], promulgated under its organic statute. The FAA's only plausible basis for the congressional power underlying its organic statute is the Commerce Clause. The FAA is in the business of securing interstate air commerce. 49 U.S.C. §40101. It is wholly appropriate to investigate a violation of 14 C.F.R. §91.13 to plausibly protect interstate commerce, its instrumentalities, or activities with a substantial relation to interstate commerce. Practically speaking, though, the regulation that the FAA seeks to enforce is being used here as a catch-all, criminal statute, like a breach of peace statute. It is not directed at commerce.

The FAA is not a fire marshal. The FAA is not in the business of regulating firearms. And the FAA does not investigate generic breaches of the peace. Under *United States v. Lopez*, 514 U.S. 549 (1995), *United States v. Morrison*, 529 U.S. 598 (2000), the Commerce Power and the Tenth Amendment, as-applied to the facts of the present case, the FAA exceeds the constitutional limit of its organic statute and impermissibly infringes on state sovereignty.

### A. Relevant Constitutional Standards

It is axiomatic that "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *United States v. Morrison*, 529 U.S. 598, 607 (2000). Article I, section 8 of the United States Constitution states, in relevant part, "Congress shall have

---

[10]14 C.F.R. §91.13(a) states, in relevant part, "Aircraft operations for the purpose of air navigation. No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."

19

Power . . . To regulate Commerce . . . among the several States . . . ."  The Tenth Amendment to the United States Constitution states, in relevant part, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  Where the Commerce Clause ends, the Tenth Amendment begins, so exceeding the former violates the latter.

With respect to the scope of the Commerce Clause, the Supreme Court has "identified three broad categories of activity that Congress may regulate under its commerce power. . . . First, Congress may regulate the use of the channels of interstate commerce. . . .  Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. . . .  Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce . . . i.e., those activities that substantially affect interstate commerce . . . ." *United States v. Lopez*, supra, 514 U.S. 558–59 (citations omitted).

### B. The *Lopez* and *Morrison* framework

*Lopez* concerned a congressional statute that made it illegal to possess a firearm in a school zone.  The Supreme Court concluded that enforcing the statute exceeded the bounds of the Commerce Clause.  Possession of a firearm in a school zone did not concern a channel of interstate commerce, nor an instrumentality or person or thing in interstate commerce.  And as a criminal statute with no connection to commerce or economic enterprise, the statute had nothing to do with commerce.  *Id.*, 561.  The Court also reasoned that upholding the government action "would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States" and eliminate "a distinction between what is truly

national and what is truly local . . . ." *Id.*, 567–68.  Ultimately, under *Lopez*, mere possession of

a gun in a particular location was not a substantial effect on interstate commerce.

*Morrison* concerned parts of the Violence Against Women Act of 1994, which provided a

federal civil remedy to victims of gender-based violence, even where no criminal charges had

been filed.  Relying on *Lopez*, the Court concluded that violence perpetrated against women was

not directly economic; even though there were indirect economic consequences, these were too

attenuated to constitute a "substantial effect" on interstate commerce.  *United States v. Morrison*,

supra, 529 U.S. 608, 612.  The Court repeated its concern that upholding the government action

would "obliterate the Constitution's distinction between national and local authority . . . ." *Id.*,

615.  In the final analysis, "a but-for causal chain from the initial occurrence of violent crime"

did not indicate a substantial effect on interstate commerce."  *See id.*, 613–14.

**C.  In the present case, §91.13 is not directed at economic activity**[11]

The facts of the present case are analogous to *Lopez* and *Morrison*.  Mere possession of

drones, and employing them in the back yard, under the tree canopy, cannot plausibly touch the

channels or instrumentalities of interstate air commerce.  The activities depicted—discharging a

handgun a few times and burning a turkey in the backyard—do not plausibly have a substantial

effect on interstate commerce.  Like the possession of a gun in *Lopez*, merely possessing items

the FAA claims may interfere with interstate commerce is not enough reasonably to constitute a

substantial effect on interstate commerce.  There being no reasonable application of §91.13 to

interstate commerce under the facts of the present case, the FAA is obviously wrong to petition

---

[11]However unlikely, is possible that the FAA will claim that the commercial activity is the publication of the YouTube videos.  First, that activity falls outside of the FAAs jurisdiction, with all the implications addressed in Part I of this memorandum.  Second, if the FAA does raise such a claim, the Haughwouts reserve the right to submit a sur-reply concerning the First Amendment implications of such a position.

the Court for enforcement of subpoenas in the present case, and the Court should deny the petition.

**D.  In the present case, §91.13 is directed at traditional state concerns, and the state has specifically declined to legislate on this issue**

It is plain that the government action is directed at the use of a flame thrower and the use of a firearm.  It is not directed at the use of a drone.  The drone merely provides the occasion—a fig leaf to become involved in something that is traditionally a matter of local concern. This is clear given the historical lack of enforcement actions against small drone users.  Like the possession of a firearm in a school zone or like gender-based violence, prosecuting the conduct depicted in the videos under §91.13 threatens to obliterate the distinction between national and local authority.  Local authorities conducted an investigation and found no wrongdoing.  Local state government considered a bill to make some of the conduct in the videos unlawful but did not adopt it.  *See* Substitute for Raised H.B. No. 5274, (status of bill) available at https://www.cga.ct.gov/asp/cgabillstatus/cgabillstatus.asp?selBillType=Bill&which_year=2016 &bill_num=5274; *see also* Ex. A.  Firearm safety and permits, and fire safety are traditionally areas of local concern, not national concern.  The FAA is using the Commerce power as a local police power, infringing on state sovereignty.  This is not a reasonable exercise of authority, and the Court should deny the petition as unreasonable.

**CONCLUSION**

For the foregoing reasons, the petition should be denied.

/s/ phv07800_____
Mario Cerame

*Until May 19, 2016*
Fazzano & Tomasiewicz, LLC
96 Oak Street
Hartford, CT 06106

Phone: 860.231.7766
Cell:   607.351.3820
Fax:    860.231.7359
mcerame@ftlawct.com


*Starting May 20, 2016*
Randazza Legal Group, LLC
4035 S. El Capitan Way
Las Vegas, NV 89147
Phone: 702.420-2001
Cell:   607.351.3820
Fax:    305.437.7662

## **CERTIFICATION**

I hereby certify that, on this 13 day of May, 2016, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

/s/ phv07800_____
Mario Cerame