UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MICHAEL HUERTA, Administrator of the Federal Aviation Administration<br>    *Petitioner*,<br><br>     v.<br><br>AUSTIN HAUGHWOUT and BRET HAUGHWOUT,<br>    *Respondents*. | No. 3:16-cv-358 (JAM) |

RULING GRANTING PETITION
FOR ENFORCEMENT OF ADMINISTRATIVE SUBPOENAS

This case concerns the investigatory authority of the Federal Aviation Administration (FAA) with respect to small unmanned flying devices (or "drones") that are owned by private citizens. The Administrator of the FAA seeks enforcement of subpoenas served against respondents Austin and Bret Haughwout. The subpoenas are designed to investigate the apparent use of weaponized drones as shown in well-publicized YouTube videos. Because I conclude that the FAA has a legitimate purpose for its subpoenas and that the subpoenas are otherwise appropriate in scope, I will grant the petition.

BACKGROUND

In 2015, two videos were uploaded in the username of "Hogwit" to YouTube. The first video is just 14 seconds long. It shows a small, unmanned flying device that hovers several feet above the ground in a wooded area. The device is about 18-inches long, and it is kept aloft by

means of four horizontally spinning rotors. A handgun is attached to the front of the device, and the video shows the handgun firing several times.[1]

The second video is about four minutes long. It shows a circular, hoop-like, flying device that hovers above ground in a clearing in the woods with a house that is visible in the background. The device has eight horizontally spinning rotors, and it bobs up and down throughout the video to about a maximum of eight feet off the ground. Some kind of a flame-throwing contraption is attached to the device. The bulk of the video shows the flame-thrower spewing intense streams of fire to scorch a turkey carcass that is mounted on a horizontal spit about five or six feet off the ground. At times, the tendrils of flame reach out twenty feet or so in length, and they ignite not only the turkey carcass but also wood debris on the ground below it. Parts of the video appear to be shot from a standing location in the clearing next to the device, and parts of the video appear to be a close-up view from the vantage point of a camera that seems to be mounted on the device itself. The video prominently bears a corporate moniker "HobbyKing.com," and it begins with the following sardonic caption: "This is how to roast your holiday turkey."[2]

Both videos understandably went "viral" and have drawn substantial media attention. The FAA has also opened an investigation. On the basis of the FAA's belief that the videos and devices in question are traceable to a young man named Austin Haughwout, the FAA has issued administrative subpoenas to Austin Haughwout as well as to his father, Bret Haughwout, who has at times corresponded with the FAA on Austin's behalf. The Haughwouts live in Clinton, Connecticut, a small town that—so far as the record reflects—is not near any airport or airfield.

---

[1] See "Flying Gun," YouTube, https://www.youtube.com/watch?v=xqHrTtvFFIs (accessed July 15, 2016).
[2] See "Roasting the Holiday Turkey," YouTube, https://www.youtube.com/watch?v=lmD3rXUR1Tw (accessed July 15, 2016).

Apart from the FAA investigation, there is no indication that the local or state police have

charged or are investigating the Haughwouts in connection with the devices or weapons that

appear on the YouTube videos.

The FAA subpoenas require the Haughwouts to submit to questioning under oath in a

deposition to be held at the Office of the United States Attorney in Connecticut and also to

produce a wide range of documents that are related to the use and related photography or video

of what the subpoenas describe as an "unmanned aircraft system (UAS)." Specifically, the

subpoenas require the production of the following documents:

(1) The use of an unmanned aircraft system (UAS);

(2) The purchase and/or use of a flamethrower in conjunction with a UAS;

(3) Internet-based advertisement revenues and/or other compensation obtained by the respondents associated with uploading and/or posting UAS content to www.YouTube.com and/or other video sharing websites;

(4) The date and time of any aerial photographic and/or videography projects conducted by the respondents, using a UAS;

(5) Aerial photographic and/or videography products and/or materials and records obtained through the use or assistance of a UAS relating to any property, building, and/or site;

(6) The brand, model, description, and other identifying data concerning the UAS used for any operation identified in relation to the paragraphs set forth above;

(7) The name, address, telephone number(s), email address(es), and other contact information available of all person(s) present during the production of the following YouTube videos published to the account "Hogwit":

a. "Flying Gun" published to YouTube on or about July 10, 2015; and

        b.  "Roasting the Holiday Turkey" published to YouTube
           on or about December 7, 2015.

Doc. #1-1 at 3-4 n.1.

The Haughwouts have declined to comply with the subpoenas. They contend that their activity is not properly subject to investigation by the FAA. This in turn has led the FAA to seek enforcement of the subpoenas in this action before the Court.

DISCUSSION

Federal administrative agencies often have broad authority to investigate activity that may be subject to federal regulation. The FAA is no exception. Congress has authorized the FAA to conduct an investigation on its own initiative *either* if a "reasonable ground appears" to believe that a person is "violating" the Federal Aviation Act (or one of the FAA's regulations) *or* if a "reasonable ground appears" about "any question that may arise" under the Act or the FAA's regulations. 49 U.S.C. § 46101(a)(2).[3] As part of the FAA's investigative authority, Congress has empowered the FAA to subpoena witnesses and records related to a matter under investigation. *See* 49 U.S.C. § 46104(a). If a recipient of an administrative subpoena declines to comply, then the agency may seek judicial enforcement of the subpoena. *See* 49 U.S.C. § 46104(b).

As the Second Circuit has noted, the federal "[c]ourts have imposed few constitutional limitations on agencies' power to issue administrative subpoenas." *In re McVane*, 44 F.3d 1127, 1134 (2d Cir. 1995). Thus, for example, an administrative subpoena is not subject to the Fourth Amendment's probable cause requirement that would otherwise apply to most searches and seizures. *See In re Gimbel*, 77 F.3d 593, 596 (2d Cir. 1996). To the contrary, an administrative agency "has a power of inquisition" akin to that of a grand jury, which it may exercise "merely

---

[3] The statute, 49 U.S.C. § 46101(a)(2), refers to the investigation of violations or questions that may arise under "this part," which encompasses a broad range of statutory provisions that are codified in the United States Code at 49 U.S.C. §§ 40101-46507.

4

on suspicion that the law is being violated, or even just because it wants assurance that it is not."
*United States v. Morton Salt*, 338 U.S. 632, 642-43 (1950).

When seeking a court order to enforce an administrative subpoena, an agency need only show: (1) that the investigation is conducted pursuant to a legitimate purpose, (2) that the information requested under the subpoena is relevant to that purpose, (3) that the agency does not already have the information it is seeking with the subpoena, and (4) that the agency has followed the necessary administrative steps in issuing the subpoena. *See N.L.R.B. v. American Medical Response, Inc.*, 438 F.3d 188, 192 (2d Cir. 2006). "A subpoena that satisfies these criteria will be enforced unless the party opposing enforcement demonstrates that the subpoena is unreasonable, or issued in bad faith or for other improper purposes, or that compliance would be unnecessarily burdensome." *Ibid.* Moreover, a court must defer to an agency's interpretation of what information is relevant to its investigation unless the agency's judgment is "obviously wrong." *Ibid.*

The FAA's regulatory and enforcement authority derives from its statute, which provides in part:

> (1) The Administrator of the Federal Aviation Administration shall develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace.
>
> (2) The Administrator shall prescribe air traffic regulations on the flight of aircraft (including regulations on safe altitudes) for . . . (B) protecting individuals and property on the ground.

49 U.S.C. § 40103(b). Pursuant to this authority, the FAA has promulgated safety regulations stating that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." 14 C.F.R. § 91.13. There can be no dispute that the

weaponized devices shown on the YouTube videos at least give rise to questions about possible danger to life or property.

Nevertheless, the Haughwouts contend that the FAA does not have a good faith or legitimate purpose for its investigation because the devices at issue are not properly subject to regulation as "aircraft" under the FAA's statute. Notably, they do not argue that the devices fall outside the literal scope of the term "aircraft" as defined by statute and related regulations. Indeed, Congress has defined the term "aircraft" in stunningly broad terms to include "any contrivance invented, used, or designed to navigate, or fly in, the air." 49 U.S.C. § 40102; *see also* 14 C.F.R. § 1.1 (defining "aircraft" to include "a device that is used or intended to be used for flight in the air").

Instead, seizing upon the very breadth of the statutory definition of "aircraft," the Haughwouts argue that the statute is indeterminate, such that it could be applied in absurd fashion to any airborne objects that could be said to "fly" in the air such as baseballs, pizza dough, and children's propeller-driven toys. They contend that the FAA cannot pursue investigation or enforcement against the devices at issue in this case absent an articulation by the agency of the outer definitional limits of the term "aircraft."

I do not agree. Although I appreciate the creativity of the Haughwouts' arguments, I know of no principle of administrative law that requires an agency to resolve beyond ambiguity the hypothetical limits of its regulatory authority before undertaking any investigative or enforcement action. Even if a good faith argument might be made that the devices at issue here could fall outside the definitional scope of the term "aircraft," the FAA has a legitimate purpose

at the least to acquire more information by means of investigation in order to assess in the first instance whether the devices are within the scope of its authority to regulate.[4]

As the Second Circuit has explained, "an administrative summons is an important tool in the preliminary information-gathering process designed to determine *whether* a violation exists, not to actually prosecute the violation." *Mollison v. United States*, 481 F.3d 119, 123 (2d Cir. 2007). Accordingly, "at the subpoena enforcement stage, courts need not determine whether the subpoenaed party is within the agency's jurisdiction or covered by the statute it administers; rather the coverage determination should wait until an enforcement action is brought against the subpoenaed party." *United States v. Construction Prods. Research, Inc.*, 73 F.3d 464, 470 (2d Cir. 1996).

It seems clear to me that Congress intends for the FAA to regulate at least *some* drones owned by individuals. *See generally* FAA Modernization and Reform Act of 2012, P.L. 112-95 §§ 331-336 (codified at 49 U.S.C. § 40101 note) (provisions governing "unmanned aircraft systems"). Further, nothing in the statutory language limits "aircraft" to *manned* aircraft. *See Huerta v. Pirker*, 2014 WL 8095629 (NTSB 2014) (holding that "aircraft" encompasses drones owned for personal use). In light of the broad statutory language, I conclude that—depending on the outcome of further FAA inquiry—it is plausible to believe that the Haughwouts' devices fall within the definition of an "aircraft" for the purposes of federal law.

Were this a penalty enforcement action against the Haughwouts for flying drones on their own property, I could see that the Haughwouts have raised substantial questions about the scope

---

[4] Although I can understand the Haughwouts' concern with the breadth of the statutory term "aircraft," I do not agree that the breadth of this term or other authority vested in the FAA violates the non-delegation doctrine. Congress has provided constitutionally requisite "intelligible principles" to guide the FAA's policymaking. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). These include, for example, directing the administrator to consider the efficient use of airspace and the safety of persons and property on the ground. *See* 49 U.S.C. § 40103.

of the FAA's regulatory enforcement authority. It appears from oral argument as well as from the FAA's website that the FAA believes it has regulatory sovereignty over every cubic inch of outdoor air in the United States (or at least over any airborne objects therein).[5] If so, that ambition may be difficult to reconcile with the terms of the FAA's statute that refer to "navigable airspace," *see, e.g.*, 49 U.S.C. § 40103(b), and that might sensibly and plausibly be understood to condition the exercise of the FAA's authority on either the protection of or regulation of activities related in some manner to navigable airspace and related equipment and facilities. *See also* 49 U.S.C. § 44701(a)(5) (FAA's authority to prescribe regulations as necessary "for safety in air commerce and national security"); *Gorman v. Nat'l Transp. Safety Bd.*, 558 F.3d 580, 590 (D.C. Cir. 2008) (noting statutory definition of "air commerce" to include "any operation or navigation of aircraft which directly affects, or which may endanger safety in, interstate, overseas, or foreign commerce").

Congress surely understands that state and local authorities are (usually) well positioned to regulate what people do in their own backyards. The Constitution creates a limited national government in recognition of the traditional police power of state and local government. No clause in the Constitution vests the federal government with a general police power over all of the air or all objects that leave the ground. Although the Commerce Clause allows for broad federal authority over interstate and foreign commerce, it is far from clear that Congress intends—or could constitutionally intend—to regulate all that is airborne on one's own property

---

[5] *See, e.g.*, Fed. Aviation Admin., *Busting Myths about the FAA and Unmanned Aircraft–Update*, http://www.faa.gov/news/updates/?newsId=76381 (accessed July 18, 2016) ("Myth #3: The FAA doesn't control airspace below 400 feet . . . Fact—The FAA is responsible for air safety from the ground up."); Fed. Aviation Admin., *Unmanned Aircraft Systems (UAS) – Frequently Asked Questions/Help*, https://www.faa.gov/uas/faqs/ (accessed July 18, 2016) (QUESTION: "If I'm just flying my UAS inside a building, or in my own yard, do I have to register it" with the FAA? ANSWER: "If you're flying indoors, you do not need to register your unmanned aircraft as the FAA does not regulate indoor UAS use. However, when flying in your own yard or over your own property, you will need to register your UAS if the UAS weighs more than 0.55 pounds.").

and that poses no plausible threat to or substantial effect on air transport or interstate commerce in general. *See, e.g.*, *United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (outlining limits of federal authority under the Commerce Clause to include the channels of interstate commerce, the instrumentalities of interstate commerce, and other activities that substantially affect interstate commerce); *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172-74 (2001) (limiting federal agency's assertion of regulatory authority under the Clean Water Act in light of constitutional limitations under the Commerce Clause).

In a different context, the Supreme Court has "said that the airspace is a public highway," but that "it is obvious that if the landowner is to have full enjoyment of the land, he must have exclusive control of the immediate reaches of the enveloping atmosphere," or else "buildings could not be erected, trees could not be planted, and even fences could not be run." *United States v. Causby*, 328 U.S. 256, 264 (1946). And so the Supreme Court recognized even 70 years ago that "[t]he landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land." *Ibid.*

If that much is clear, does it follow that this foundational principle must vanish or yield to FAA dictate the moment that a person sets any object aloft (*i.e.*, an "aircraft") no matter how high in the airspace outside one's home? This case does not yet require an answer to that question. Regardless, as with the advent of airplanes before them, the next generation of drones and similar flying contraptions will continue to challenge and shape the law that governs them. *See generally* Stuart Banner, WHO OWNS THE SKY: THE STRUGGLE TO CONTROL AIRSPACE FROM THE WRIGHT BROTHERS ON (Harv. Univ. Press 2008).

**CONCLUSION**

The petition for enforcement of the administrative subpoenas (Doc. #1) is GRANTED.

Respondents shall comply with the requirements of the subpoenas within 30 days or on such

other date as the parties may mutually agree.[6]

It is so ordered.

The Clerk of Court shall close the case.

Dated at New Haven this 18th day of July 2016.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[6] This ruling enforcing the petitions is without prejudice to the Haughwouts' right to assert any lawful objection they may have under the Fifth Amendment privilege against self-incrimination.